**SOUTHEAST BOOKSELLERS ASSOCIATION, et al., Plaintiffs,**

v.

**Henry D. MCMASTER, Attorney General of South Carolina, et al., Defendants.**

No. CIV.A. 2:02–3747–23.

United States District Court, D. South Carolina, Charleston Division.

July 25, 2003.

Armand G. Derfner, Charleston, and Janis Kestenbaum, Wilmer, Cutler & Pickering, Washington, DC, for plaintiffs.

J. Emory Smith, Jr., S.C. Attorney General's Office, Columbia, SC, for Defendants.

## ORDER

DUFFY, District Judge.

This matter is before the court upon Defendants' Motion to Dismiss or, in the Alternative, to Abstain or Certify. The court conducted a hearing on Defendants' motion on July 15, 2003. For the reasons set forth below, Defendants' motion is denied.

## I. BACKGROUND

Plaintiffs, with the exception of Families Against Internet Censorship ("FAIC"), are organizations that represent artists, writers, booksellers, and publishers who use the Internet to engage in expression, including graphic arts, literature, and health-related information. It appears that some of these organizations maintain their own Web sites. All either post or have members that post material on the Web. The Web sites contain resources on, *inter alia*, visual art, books, and stock photographic images.

FAIC is an organization that represents families with Internet access and at least one child. These families are advocates of the right to "acquire educational and artistic material" via the Internet. (Compl. at 10.) FAIC fights against government regulation and censorship of Internet content, arguing that parents should have ultimate authority over the content to which their children are exposed on the Internet.

In this action, Plaintiffs have brought a pre-enforcement constitutional challenge to permanently enjoin the operation of S.C.Code § 16–15–385. Section 16–15–385 provides criminal sanctions for "disseminating harmful material to minors." The statute provides that "mistake of age is not a defense to a prosecution under this section" unless "before disseminating or exhibiting the harmful material or performance, the defendant requested and received a driver's license, student identification card, or other official governmental or educational identification card or paper" indicating that the recipient was at least eighteen years old. S.C.Code Ann. § 16–15–385(C)(3). "Harmful to minors" is defined by use of the following standard:

(a) the average adult person applying contemporary community standards would find that the material or performance has a predominant tendency to appeal to a prurient interest of minors in sex; and

(b) the average adult person applying contemporary community standards would find that the depiction of sexually explicit nudity or sexual activity in the material or performance is patently offensive to prevailing standards in the adult community concerning what is suitable for minors; and

(c) to a reasonable person, the material or performance taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

S.C.Code Ann. § 16–15–375. A violation of § 16–15–385 is a felony, punishable by up to five years in prison, a fine of $5000, or both.

The controversy in this case centers around an amendment to the Act, signed by Governor Hodges on July 20, 2001, which added the following definition of

"material": " 'Material' means pictures, drawings, video recordings, films, *digital electronic files, or other visual depictions or representations* but not material consisting entirely of written words." S.C.Code § 16–15–375(2) (emphasis added). Thus, the Act, together with this amendment, proscribes the dissemination to minors of obscene "digital electronic files." Plaintiffs allege that this proscription violates the First Amendment and the Commerce Clause because it prohibits adults from viewing and sending constitutionally-protected images over the Internet, and has the effect of prohibiting constitutionally-protected communications nationwide. (Compl. at 1–2, 26.) Defendants have filed a motion to dismiss, arguing that Plaintiffs lack standing and have failed to state a claim upon which relief may be granted. In the alternative, Defendants have moved to abstain or to certify questions of statutory construction to the South Carolina Supreme Court. (Def. Mot. at 1.)

## II. MOTION TO DISMISS

### A. Rule 12(b)(1) Motion to Dismiss for Lack of Standing

Defendants argue that Plaintiffs lack standing and fail to allege a justiciable controversy because Plaintiffs have not alleged that they publish material considered "harmful to minors" within the meaning of S.C.Code § 16–15–375. (Def.'s Mot. at 1–2.) Defendants also argue that Plaintiffs do not allege specific facts to show that the materials in question would be subject to the Act. (Def. Memo at 4–5.) In reviewing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), all of Plaintiffs' alleged facts are taken to be true, and dismissal is warranted only when it is beyond doubt that Plaintiffs can prove no facts that would establish subject matter jurisdiction. *See Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982).

At the hearing, Plaintiffs clarified that they are claiming standing based upon injuries to their members. An organization has standing to sue on behalf of its members if: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; (3) neither the claim asserted nor relief requested require the participation of individual members. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

The first prong of this test requires the court to determine whether the individual members of each organization would be able to demonstrate a cognizable injury-in-fact. *Id.* In a First Amendment setting, a plaintiff is not required to endure prosecution in order to demonstrate a cognizable injury. Instead, "[w]hen a plaintiff faces a credible threat of prosecution under a criminal statute he has standing to mount a pre-enforcement challenge to that statute." *North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 710 (4th Cir.1999) (citing *Wilson v. Stocker,* 819 F.2d 943, 946 (10th Cir.1987)); *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). "A non-moribund statute that 'facially restrict[s] expressive activity by the class to which the plaintiff belongs' presents such a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary." *Bartlett,* 168 F.3d at 710. Plaintiffs need not show that their members' speech "clearly" fits within the terms of the Act. Rather, Plaintiffs need only show that the statute "arguably" covers the speech in question. *Majors v. Abell,* 317 F.3d 719, 721 (7th Cir.2003).

Applying these principles here, the court concludes that Plaintiffs' individual members would be entitled to sue on their

own behalf because a credible threat of prosecution exists under the Act. The Act, which the parties agree is non-moribund, is a content-based regulation of protected speech that applies to any individual, or group, who disseminates or exhibits "harmful material" to minors. S.C.Code § 16–15–385. American Booksellers Foundation for Free Expression ("ABFFE"), Southeast Booksellers Association ("SEBA"), Association of American Publishers, Inc. ("AAP"), Print Studio South ("PSS"), and Comic Book Legal Defense Fund ("CBLDF") all represent members who use the Internet, in part, to reproduce, display, or receive materials "that contain nudity and depictions of the nude human body."[1] (Compl. at 8.) The sixth Plaintiff, FAIC, has a constitutionally-protected interest in receiving the speech in question. *Va. St. Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("[T]he protection afforded is to the communication, to its source and to its recipients both."). Thus, all of the Plaintiffs have demonstrated that the Act "arguably" governs the speech in question and, therefore, facially restricts their speech. Defendants do not produce any compelling evidence to contradict Plaintiffs' allegations that the Act facially restricts their members' speech. *See Bartlett,* 168 F.3d at 710; *see also Wilson v. State Bar of Ga.,* 132 F.3d 1422, 1428 (11th Cir.1998) (agreeing "with the First Circuit's admonition that the credible threat of prosecution standard 'is quite

forgiving'" in the First Amendment context) (citing *New Hampshire Right to Life,* 99 F.3d at 14). Consequently, the first *Hunt* element is satisfied because Plaintiffs' members have standing under the "credible threat of prosecution" standard set forth in *Bartlett.*

The second *Hunt* element—whether the interests that the organizations are seeking to protect are germane to the organizations' purposes—also has been satisfied. PSS is a non-profit arts organization that is dedicated, in part, to providing exposure for its member artists. One of AAP's purposes is to promote intellectual freedom and to oppose censorship. SEBA promotes the free exchange of ideas and maintains an online book-selling forum. Similarly, ABFFE, FAIC, and CBLDF are organizations "dedicated to promoting free speech." Enjoining the Act is clearly germane to each organizations' purposes. (Pl. Memo. at 8.)

Finally, the third *Hunt* element has been met because all of the members share the same interest of guarding the right to produce and receive protected speech; thus, their interests are fully represented by their organizations. *Maryland Highways Contractors Ass'n, Inc. v. State of Md.,* 933 F.2d 1246, 1252 (4th Cir.1991) (noting that courts generally find that member participation is required when the various members' interests are diverse and conflict). Because Plaintiffs meet the *Hunt* test for organizational standing, Defendants' motion for dismissal under Fed.R.Civ.P. 12(b)(1) is denied.[2] *Cf.*

---

1. PSS represents local artists and has a virtual art gallery that displays artwork of its members. SEBA represents independent booksellers, librarians, book reviewers, and writers in Florida, South Carolina, North Carolina, Georgia, Louisiana, Alabama, Arkansas, Tennessee, Kentucky, Virginia and Mississippi. ABFFE represents independent booksellers throughout the country. CBLDF represents artists, publishers, and writers in the comics community. AAP represents American publishers, and its members maintain Web sites whereby they display contents and images of various books.

2. Defendants also argue that Plaintiffs have failed to make "particularized allegations" of injury-in-fact, causation, and redressability. Although each of these requirements apply in pre-enforcement First Amendment cases, *see,*

*ACLU v. Reno*, 31 F.Supp.2d 473, 481 (E.D.Pa.1999) (finding Plaintiff ABFFE had standing), *aff'd*, 217 F.3d 162 (3d Cir. 2000), *rev'd on other grounds, Ashcroft v. ACLU*, 535 U.S. 564, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002); *ACLU v. Johnson*, 194 F.3d 1149, 1155 (10th Cir.1999) (finding standing for ABFFE and AAP).

## B. 12(b)(6) Motion to Dismiss

Defendants next move to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). In reviewing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), all well-pleaded allegations in the Complaint are taken as true, and dismissal is warranted only when it is beyond doubt that Plaintiffs can prove no set of facts which would entitle them to relief. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999); *Johnson v. Mueller*, 415 F.2d 354, 355 (4th Cir.1969).

### 1. First Amendment Violation

■ Plaintiffs argue that the Act, as a content-based restriction on speech, cannot survive strict scrutiny review. Moreover, according to Plaintiffs, the Act is unconsti-

tutionally overbroad because it substantially infringes on protected speech of adults.

"As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. The Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 1399, 152 L.Ed.2d 403 (2002). However, "[t]he freedom of speech has its limits; it does not embrace certain categories of speech, including … obscenity." *Id.; Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). According to Defendants, the Act does not implicate any protected speech because the Act's definition of "harmful to minors" complies with the test for obscenity set forth in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).[3] It is true that the Act defines "harmful to minors" by reference to the test set forth in *Miller*, and it is also true that obscenity is not entitled to any First Amendment protection. However, what is considered obscene for an audience of minors is not necessarily considered obscene for an adult audience. *Ginsberg v. State of N.Y.*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) ("[T]he concept of obscenity or of unprotected matter may vary according

---

*e.g., Larson v. Valente*, 456 U.S. 228, 233–36, 238–44, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), particularized allegations are not required at the pleading stage, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' "). This approach is commensurate with the notice pleading goals of Rule 8(a). *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Plaintiffs have generally alleged injury-in-fact, causation, and redressability. Thus, this argument is without merit.

**3.** In *Miller*, the Supreme Court reviewed a criminal conviction against a commercial

vendor who mailed brochures containing pictures of sexually explicit activities to individuals who had not requested such materials. *Id.* at 18, 93 S.Ct. 2607. The Court set forth the following test for obscenity, which controls to this day:

> (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24, 93 S.Ct. 2607 (internal quotation marks and citations omitted).

to the group to whom the questionable material is directed or from whom it is quarantined." (internal quotation marks omitted)); *see also Santosky v. Kramer,* 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *FCC v. Pacifica Found.,* 438 U.S. 726, 749–50, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). The South Carolina Act explicitly defines obscenity by reference to the type of content that is "suitable for minors." Thus, it is incorrect to assert that the protected speech of adults is not implicated by § 16–15–385.

▇ Because the Act constitutes a content-based restriction affecting the protected speech of adults, it must be evaluated pursuant to strict scrutiny.[4] *Reno v. ACLU,* 521 U.S. at 870, 117 S.Ct. 2329 (holding that content-based regulation of Internet speech is subject to strict scrutiny). While there is an indisputably "compelling interest in protecting the physical and psychological well-being of minors," the government's chosen means to achieve that end must be "carefully tailored." *Id.* Notably, several federal courts have found that, where the Internet is involved, prohibitions against disseminating harmful materials to minors cannot withstand strict scrutiny review because such prohibitions are not narrowly tailored to the compelling interest of shielding minors from obscenity.[5] *See id.* (striking down Communications Decency Act because it was not narrowly tailored to government interest and excessively suppressed speech that adults have a constitutional right to receive); *Ashcroft v. ACLU,* 535 U.S. 564, 122 S.Ct.

1700, 152 L.Ed.2d 771 (2002) (remanding for determination of whether Child Online Protection Act is narrowly tailored to government interest of protecting minors from obscenity); *ACLU v. Ashcroft,* 322 F.3d 240, 261 (3d Cir.2003) (holding that prohibition against dissemination of obscenity to minors did not employ the "least restrictive means" to effect the Government's compelling interest in protecting minors, and therefore violated strict scrutiny test under First Amendment). Moreover, several courts have held that state and federal provisions analogous to the one at issue here are substantially overbroad and chill the protected speech of adults. *ACLU v. Ashcroft,* 322 F.3d 240, 267 (3d Cir.2003) (concluding that prohibition against disseminating obscenity to minors substantially encroaches on free speech rights of adults); *Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957) (holding that the First Amendment will not permit restrictions that interfere with the rights of adults to obtain constitutionally protected speech and effectively "reduce the adult population … to reading only what is fit for children."). *But see Ashcroft v. ACLU,* 535 U.S. 564, 122 S.Ct. 1700, 1713, 152 L.Ed.2d 771 (holding that the use of the *Miller* definition of obscenity, as it applies to minors, does not render COPA substantially overbroad).

In sum, Plaintiffs have adequately alleged an undue restriction on the protected speech of their adult members, and Defendants have not shown that Plaintiffs can prove no set of facts that would entitle

---

4. The level of scrutiny that applies to particular types of speech depends in part on the particular speech medium involved. Thus, for example, attempts to regulate the print media have been subjected to strict scrutiny, while the broadcast media have been afforded less First Amendment protection. After examining the nature of the Internet, and concluding that it is more similar to the telephone as a communication medium than to

the broadcast media, the Court in *Reno* determined that the Internet deserved the highest level of First Amendment protection.

5. There is no indication in the case *sub judice* that the State considered less restrictive means, such as filtering mechanisms, to protect children from receiving obscene materials over the Internet.

them to relief.[6] Accordingly, Defendants' motion to dismiss Plaintiffs' First Amendment claim is denied.

### 2. Commerce Clause Claim

■ Plaintiffs also state a viable claim for violation of the Commerce Clause. The "dormant implication of the Commerce Clause prohibits state ... regulation ... that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'" *General Motors Corp. v. Tracy*, 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980)) (citations omitted). Furthermore, the Supreme Court has long recognized that certain types of commerce are uniquely suited to national, as opposed to state, regulation. *See, e.g., Wabash, St. L. & P.R. Co. v. Illinois*, 118 U.S. 557, 7 S.Ct. 4, 30 L.Ed. 244(1886) (holding states cannot regulate railroad rates).

Section 16–15–385 arguably violates the Commerce Clause in at least two ways: (1) it constitutes an unreasonable and undue burden on interstate and· foreign commerce; and (2) it subjects interstate use of the Internet to inconsistent state regulation. *See Johnson*, 194 F.3d at 1160–61 (discussing likelihood of constitutional infirmity of similar state statute on dormant commerce clause grounds); *Am. Libraries Ass'n v. Pataki*, 969 F.Supp. 160, 168–83 (S.D.N.Y.1997). As the *Pataki* court observed:

> The unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by states that the actor never intended to reach and possibly was unaware were being accessed. Typically, states' jurisdictional limits are related to geography; geography, however, is a virtually meaningless construct on the Internet.

*Id.* at 168–69. Because Plaintiffs could prove a set of facts that would entitle them to relief on their Commerce Clause claim, Defendants' Rule 12(b)(6) motion is denied.

### III. MOTION TO ABSTAIN

■ Defendants next move for abstention under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). (Def. Mot. at 9.) The prerequisites for *Pullman* abstention are: (1) substantial uncertainty as to the meaning of the state law in question; and (2) a reasonable possibility that a state court's clarification of the state law would resolve the need for a federal constitutional ruling. *Kusper v. Pontikes*, 414 U.S. 51, 54–55, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973). The Supreme Court has indicated that abstention is disfavored in the setting of sensitive Constitutional rights, such as freedom of speech. *See, e.g., Procunier v. Martinez*, 416 U.S. 396, 404, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413–14, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). Similarly, the Fourth Circuit has noted that courts "have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment, because the delay involved might itself effect the impermissible chilling of the very constitutional right [the litigant] seeks to protect." *Bartlett*, 168

---

**6.** Defendants also argue that the Act is constitutional because it excludes material consisting entirely of words. (Memo at 7–8.) Although it is true that the Act excludes such material, Plaintiffs claim that their members send and receive *images*, which are also entitled to constitutional protection. *See Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

F.3d at 711 n. 1 (internal citations omitted).

■ Defendants contend that the South Carolina Supreme Court could interpret the statute to avoid the federal constitutional questions presented here. (Memo at 9.) First, they briefly argue that the South Carolina Supreme Court could clarify the scope of "digital electronic files," which was added to the definition of "material" in Section 16–15–375(2). To the extent that Defendants suggest that the phrase could be interpreted to *not* apply to the Internet, this argument is unpersuasive because the plain meaning of "digital electronic files" incorporates files that are sent and received via the Internet.

Next, Defendants argue that the South Carolina Supreme Court might interpret the Act to include a scienter requirement. (Def. Mot. at 10, 12.) Although it is true that a criminal statute is generally interpreted to include an element of scienter or criminal intent, "[t]he power of the Legislature to declare what acts shall constitute crimes ordinarily includes the power to make the commission of the act criminal without regard to the intent or knowledge of the accused." *Guinyard v. South Carolina*, 260 S.C. 220, 195 S.E.2d 392, 395 (1973). Thus, "[t]he legislature ... may forbid the doing of an act and make its commission criminal without regard to the intent or knowledge of the doer, and if such legislative intention appears, the courts must give it effect." *Id.*

Here, the legislature has clearly provided criminal sanctions for "disseminating harmful material to minors" without regard to the intent, or lack thereof, of the wrongdoer. The statute explicitly provides that "mistake of age is not a defense to a prosecution under this section," subject to limited exceptions that are not applicable in this case. S.C.Code Ann. § 16–15–385(C)(3). Thus, any attempt to interpret § 16–15–375 as including a scienter

element would be contrary to the plain language of the statute. Neither this court nor the South Carolina Supreme Court is at liberty to rewrite the express provisions of the statute in order to render it constitutional. *Cf. United States v. Albertini*, 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) ("Statutes should be construed to avoid constitutional questions, but this interpretive canon is not a license for the judiciary to rewrite language enacted by the legislature.").

Moreover, even if it were possible to interpret the Act as including a scienter element, such an interpretation would not resolve the constitutional issues because the terms of the Act allow for a "heckler's veto." (Pl. Opp. Memo at 29–30) (citing *Reno v. ACLU*, 521 U.S. at 880, 117 S.Ct. 2329 (discussing problem of "heckler's veto")); *see also Johnson*, 194 F.3d 1149, 1155 (10th Cir.1999) (same). The "heckler's veto" issue was discussed in *Reno*, where the government attempted to defend the Communications Decency Act on the grounds that the "knowledge requirement" sufficiently narrowed the statute. *Reno*, 521 U.S. at 880, 117 S.Ct. 2329. The Supreme Court rejected the argument because, distinct from the settings in which the Act was originally designed to operate (for example, criminalizing a merchant's sale of a pornographic magazine to someone known to him to be a minor), the nature of the Internet is such that identities are no longer known or ascertainable—therefore, the "heckler's veto" enables anyone to expose another to prosecution by informing that person that a minor will be viewing the speech deemed by the Act to be "harmful."

Defendants have not shown that there is substantial uncertainty as to the meaning of the Act, and they have not identified any issues that would obviate the need for a federal constitutional ruling. According-

ly, the court declines to abstain pursuant to *Pullman.*

### IV. MOTION TO CERTIFY

 Finally, Defendants argue that, even if abstention is not warranted, the court should certify various questions about the scope of the Act to the South Carolina Supreme Court. Defendants seek certification of the following questions: (1) the meaning of the term "digital electronic files"; (2) whether the Act includes a scienter requirement; (3) whether "harmful to minors" sets standards based upon the youngest Internet users; and (4) the meaning of "community" in the term "contemporary community standards."

For support, Defendants rely on the Fourth Circuit's recent holding in *PSINet, Inc. v. Chapman,* 317 F.3d 413, 422 (4th Cir.2003), wherein the Fourth Circuit certified various questions to the Virginia Supreme Court in the context of a similarly-worded Virginia statute. The Fourth Circuit held that certification is the proper course where an authoritative state court ruling "would substantially aid [the court's] review of [the] constitutional holding." *See id.*

The court finds that *PSINet* is distinguishable and does not require certification of any of the questions identified by Defendants. As an initial matter, in *PSINet,* the Fourth Circuit was reviewing the entry of a preliminary injunction. Because enforcement of the statute had been enjoined, there was no danger that the delay involved in certifying the questions would itself impermissibly chill protected speech. Here, on the other hand, Plaintiffs have neither sought nor obtained an injunction against the enforcement of the statute. In these circumstances, the court must be mindful of the Fourth Circuit's admonition to avoid delay in resolving facial challenges that are based upon the First Amendment. *Bartlett,* 168 F.3d at 711 n. 1 (noting that abstention is disfavored "because the delay involved might itself effect the impermissible chilling of the very constitutional right [the litigant] seeks to protect.").

Furthermore, the two questions certified in *PSINet* are not implicated by South Carolina's Act. In *PSINet,* the Fourth Circuit certified the following questions: (1) "would the use of any of the technological access controls identified by the Attorney General of Virginia preclude conviction under Virginia Code § 18.2–391 as amended in 1999?"; and (2) "does the prohibition against knowingly displaying pornographic materials that are 'harmful to juveniles' apply to displays made only in connection with the sale, rental, or loan of such materials? If not, what must the government establish to prove that a defendant has knowingly displayed such materials 'for commercial purpose'?" *PSINet,* 317 F.3d at 419. Resolution of these questions was necessary because of the terms of Virginia's statute, which prohibited "the knowing display of sexually harmful material *for commercial purpose* in any electronic file or message *in a manner whereby juveniles may examine and peruse the material.*" *Id.* at 415 (emphasis added). South Carolina's Act, on the other hand, is not limited to "commercial purposes," and it does not contemplate a similar ability to avoid prosecution through the use of compliance measures.

Most importantly, unlike the questions that were certified in *PSINet,* the questions identified by Defendants would not substantially assist the court's review of the constitutional issues. As discussed above, the term "digital electronic files" is unambiguous and is not subject to any meaningful narrowing construction. The statute also plainly excludes a scienter requirement. Similarly, the term "community" is expressly defined in § 16–15–305(E)

as follows: "'community standards' used in determining prurient appeal and patent offensiveness are the standards of the area from which the jury is drawn." Thus, there is no reason to certify any of these questions to the South Carolina Supreme Court.

Defendants also assert that "the Supreme Court could address ... whether, as used in § 16–15–375 and applied to § 16–15–385, material 'harmful to minors' sets standards based upon the youngest [I]nternet users" rather than on older minors," suggesting that if the statute were construed to criminalize only material deemed harmful for older adolescents, it would be constitutional. Regardless of how the Supreme Court might answer this question, the answer would have little, if any, effect on Plaintiffs' constitutional challenges. The gravamen of Plaintiffs' complaint is that the Act infringes their right *as adults* to engage in Internet communications that are protected as to adults. Even if the Act were construed to criminalize only material deemed harmful for older adolescents, it would still censor a certain category of material that is fully protected for adults. Accordingly, certification of this question would not substantially aid or alter the court's review of the constitutional issues.

## V. CONCLUSION

It is, therefore,

**ORDERED,** for the foregoing reasons that Defendants' Motion to Dismiss and Alternative Motion to Abstain or Certify is **DENIED.**

**AND IT IS SO ORDERED.**